OPINION OF THE COURT
Gary F. Marton, J.
The above-captioned is an alleged “illegal lockout” proceeding brought pursuant to RPAPL 713 (10). Petitioner asserts that he was the tenant of the certain premises and that respondent Back On Track Group, Inc. (BOT) wrongly deprived him of possession thereof. BOT denies the same and asserts that petitioner was a licensee whose license to be at the premises BOT properly terminated. Respondent Entelis, who occupies the premises previously occupied by petitioner, asserts that he should be left alone because he is an innocent bystander to the quarrel between petitioner and BOT.
Now, after considering the testimony and the other evidence at the trial herein, the court makes the following findings of fact, reaches the following conclusions of law, and grants petitioner a judgment of possession. A warrant may issue forthwith but its execution is permitted only as set out below.
The Facts
The court finds that in January 2014 petitioner was looking for a place to live. In pursuit of that goal he went to the Queens County offices of BOT which manages several residences of a type that have come to be called three-quarter houses. There petitioner was presented with a dozen or more forms. He signed them all. Petitioner testified that he did not read them before he signed them and the court finds that this testimony was credible.
The forms advised petitioner that he would be placed in a “program house.” They included a list of 15 rules prefaced by a declaration that “I understand that I am living in a Temporary Shelter. This is not my permanent residence.” The 15 rules *912 include a ban on visitors, a daily curfew,* a prohibition on drug and alcohol use, and a consent to random urine and other testing. The rules required petitioner to leave the building from 10:00 a.m. to 2:00 p.m. every day during the workweek inasmuch as the building would be closed during those hours. Violation of the rules would result in a “discharge” from the program. The rules also stated: “Back on Track group, Program stay is 6-9 months after completion of program you must find other housing.”
The forms required petitioner to attend a substance abuse or other appropriate program five days per week. Petitioner testified that he attended such a program but that it met only for an hour per day and only three days per week. The court finds that this testimony was credible and that the program was not affiliated in any way with BOT. There was no contention that any program attended by anyone living in a BOT residence was affiliated with, directly or indirectly, BOT.
The court finds that later that day (i.e., Jan. 14, 2014) BOT personnel drove petitioner to a BOT satellite office at 700 (or 698) New Lots Avenue where he was assigned to the far left top bunk in the left room on the first floor of the building at 696 New Lots Avenue. BOT also assigned closet space to petitioner.
BOT did not provide this residence to petitioner for free; instead, BOT charged $215 per month. This charge, perhaps not coincidentally equal to the maximum sum that the City of New York pays as a shelter allowance for a single adult, was paid to BOT by the City of New York’s Human Resources Administration (HRA) through its Department of Social Services (DSS). The basis for HRA’s and/or DSS’s determination to make these payments to BOT on petitioner’s behalf is not known. No party contended, however, that either before or after approving payment HRA/DSS either reviewed the BOT forms or inspected the premises.
On April 21, 2014 a member of BOT’s staff told petitioner that he was going to be “discharged” from the program, i.e., required to leave 696 New Lots Avenue. Petitioner slept at the premises that night, but was awakened by BOT personnel at about 5:30 a.m. on April 22, 2014 and was told that he had to leave because he had not complied with the rules regarding staying out at night. Petitioner denied that he had violated the rules and declined to leave.
*913 BOT called the police. They came but, because BOT did not have supporting paper work, declined to enforce BOT’s claimed right to compel petitioner to leave. BOT then called its office in Queens, had paper work brought to 700 New Lots Avenue, and called the police again. The police came again and this time, after reviewing BOT’s paper work, advised petitioner that he did not seem to have a right to stay. The court finds that petitioner feared, quite reasonably, that if he did not leave he would be arrested, and so he left. This proceeding ensued.
The court finds that respondent Entelis was wholly uninvolved in the dispute between petitioner and BOT, that he became a resident of 696 New Lots Avenue on April 21, 2014, and that as of April 22, 2014 BOT assigned him to the bunk bed that had been occupied by petitioner.
The Parties’ Contentions
BOT asserts that petitioner was a licensee, that he did not have a right to possession of any real property, and that as a result, even if he was wrongly terminated from “the program,” the instant proceeding to recover the possession of real property may not be maintained. In support, respondent relies heavily on Paulino v Wright (210 AD2d 171 [1st Dept 1994], lvs dismissed 85 NY2d 858 [1995], 87 NY2d 918 [1996]), Federation of Orgs., Inc. v Bauer (6 Mise 3d 10 [App Term, 2d Dept, 9th & 10th Jud Dists 2004]), Coppa v LaSpina (41 AD3d 756 [2d Dept 2007]) and David v #1 Mktg. Serv., Inc. (113 AD3d 810 [2d Dept 2014]). BOT also contends that by signing the forms petitioner waived the tenancy rights that he asserts here.
The four cases, while instructive, are not dispositive. In Paulino the Court upheld the City of New York’s use of the police to remove squatters from a city-owned building. The squatters, however, had never received permission from the City to enter the premises and the Court characterized them in no uncertain terms as “illegal occupants” (Paulino, 210 AD2d at 172). Here, petitioner was not a squatter or otherwise an illegal occupant; instead, BOT had explicitly granted him permission to enter 696 New Lots Avenue and to occupy a specific space there.
Bauer concerned a two-attorney stipulation of settlement that had been negotiated in a prior lawsuit. The stipulation required Bauer, a participant in a program that provided housing and other services, to find alternative housing and to cooperate in efforts to that end. When Bauer did not cooperate as stipulated, a summary holdover proceeding ensued in which a judgment of possession was entered against him. Bauer appealed from the *914 judgment and argued that he was entitled to relief because the underlying predicate notice was defective in that it mischaracterized him as a licensee rather than as a month-to-month tenant. The court rejected this argument and held that he was not a tenant. The court wrote:
“Here, the fact that the admission agreement permitted appellant to reside in petitioner’s premises, but did not grant him exclusive dominion and control over a specifically identified portion of petitioner’s premises, is dispositive inasmuch as exclusive possession and control of specified real property is essential to the existence of a landlord-tenant relationship. Moreover, the admission agreement indicated that the appellant’s residence in petitioner’s premises was part of a package of services provided to appellant, among others, and such services were not merely incidental to appellant’s residence at the premises. In light of the foregoing, it is apparent to us that appellant was a licensee rather than a tenant” (Bauer, 6 Misc 3d at 12 [citation omitted]).
BOT asserts that under Bauer petitioner was a licensee, not a tenant. This court is not persuaded. The principal issue in Bauer was whether to vacate a two-attorney stipulation of settlement. Further, unlike the residency in Bauer that was “part of a package of services” (id.), BOT did not provide petitioner with any services, much less a package of which residency was one element. The court notes too that unlike Bauer petitioner was granted what can be characterized as exclusive dominion and control over a specifically identified portion of the premises, to wit, the bunk bed and the closet space.
Coppa is inapposite here. Coppa was a participant in a federally funded program under 42 USC §§ 11381-11389. The program provided rehabilitative services and group housing to certain persons suffering from mental illnesses. To gain entry into the program, Coppa agreed to waive certain rights under that statute. When the program director excluded Coppa from the group residence by changing the locks, Coppa sought a declaratory judgment (and related relief) that the waiver was void. The Court denied that relief. Although the Court held that Coppa was a licensee and not a tenant, this holding rested in substantial part on Coppa’s waiver of her rights under federal law. Here, by contrast, no rights under federal law are at issue; instead, the only rights at issue here arise under state law.
*915 Neither is the decision in #1 Mktg. controlling here. That case concerned three-quarter houses substantially the same as the “program house” here. The issue there, however, was whether the residents were rent-stabilized tenants; the Court held that they were not. There is no such issue in the instant proceeding. The #1 Mktg. court did go on to state that the residents there were licensees, but that characterization was not necessary to the Court’s ratio decidendi, and therefore it is dicta which does not compel a specific result here.
BOT also asserts an affirmative defense of waiver, i.e., that petitioner waived any and all tenancy rights by signing the forms on January 14, 2014 at BOT’s office in Queens County. However, a “waiver is the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved” (Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y., 61 NY2d 442, 446 [1984] [citation omitted]). The court declines to infer from the signing of the forms by petitioner, who did not read them and was known to have a substance abuse issue, that petitioner relinquished known rights. Further, while individual rights such as the right to a jury trial may be waived (see e.g. P & J Hous. Partners, LLC v Alvarado, 34 Misc 3d 130[A], 2011 NY Slip Op 52310[U] [App Term, 1st Dept 2011]), here the waiver claimed by BOT is so broad and all-encompassing as to be tantamount to a waiver not of specific tenant’s rights but of the status of being a tenant. Such a waiver, as discussed below, is trumped by controlling statute.
Petitioner relies mainly on the commands of RPAPL 711 and Administrative Code of the City of New York § 26-521. In pertinent part, RPAPL 711 provides:
“A tenant shall include an occupant of one or more rooms in a rooming house or a resident, not including a transient occupant, of one or more rooms in a hotel who has been in possession for thirty consecutive days or longer; he shall not be removed from possession except in a special proceeding.”
In pertinent part, Administrative Code § 26-521 (a) provides that it “shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer” by the use of force or by a threat to use force or by engaging or threatening to engage in conduct that would interfere with the occupant’s peaceful enjoyment of the premises. In pertinent *916 part, Administrative Code § 26-522 (a) (1) provides that “ ‘[d] welling unit’ means a dwelling unit as such term is defined in subdivision thirteen of section 27-2004 of the housing maintenance code.” Section 27-2004 (a) (13) of the Housing Maintenance Code (Administrative Code of City of NY, tit 27, ch 2) provides that a “[d] welling unit shall mean any residential accommodation in a multiple dwelling or private dwelling.”
Discussion
In significant ways, petitioner’s residential accommodation at 696 New Lots Avenue did not resemble a conventional tenancy. Petitioner did not have a right to possession of an apartment or even of a room; he could claim as his own only a bunk bed and certain closet space. Also, petitioner was barred from having visitors, and for four hours per day, five days out of every seven, he was required to absent himself from the building in which the premises are located. From this perspective, what BOT granted to petitioner seems more a license than a tenancy.
Yet it is essential to a license that it be terminable at will and that there be an absence of “exclusive dominion and control over a specifically identified portion of petitioner’s premises” (Bauer, 6 Misc 3d at 12).
“What defines the proprietary relationship between the parties is not its characterization or the technical language used in the instrument, but rather the manifest intention of the parties. . . . Whereas a license connotes use or occupancy of the grantor’s premises, a lease grants exclusive possession of designated space to a tenant, subject to rights specifically reserved by the lessor. The former is cancellable at will, and without cause. Where one party’s interest in another’s real property exists for a fixed term, not revocable at will, and terminable only on notice, a landlord-tenant relationship has been created” (American Jewish Theatre v Roundabout Theatre Co., 203 AD2d 155, 156 [1st Dept 1994] [citations omitted]).
BOT set out 15 rules, compliance with which would lead to a continued residency for an estimated six to nine months; this, the court finds, is at odds with the idea of a residence terminable at will. And it is plain that BOT granted petitioner exclusive possession of a certain part of 696 New Lots Avenue even if that part was, relatively speaking, small.
For this court what tips the balance is BOT’s assertion that a residency at a “program house” would in the ordinary course *917 last for six to nine months. This is much longer than the 30-day period that the legislature has decreed should be the outside limit after which removal of someone from premises must be preceded by a special proceeding. Petitioner was at the premises for 97 days. Accordingly, the court holds that petitioner’s eviction was illegal and the court grants petitioner a judgment of possession.
Entelis is an innocent third party here. Petitioner did not allege, much less offer evidence, that Entelis was in cahoots with BOT or otherwise played a role in the illegal eviction that took place here. The court declines to allow the warrant to be executed so as to evict him. Instead, the court provides that the warrant may issue forthwith but may be executed and petitioner restored to the premises now occupied by Entelis upon Entelis’ departure from the premises.
The court also provides that BOT shall offer to petitioner the next bunk bed available at 696 New Lots Avenue should such a bunk bed become available before the one occupied by Entelis becomes available (cf. New York City Hous. Auth. Kingsborough Houses v Sullivan, 4 Misc 3d 131[A], 2004 NY Slip Op 50697[U], *2 [App Term, 2d Dept, 2d & 11th Jud Dists 2004] [where the court found that the tenant had been evicted from a New York City Housing Authority apartment because the City of New York’s Department of Social Services had failed to pay rent timely, that the eviction was wrongful, and that the tenant should be restored “to another suitable apartment if, or as soon as, one is available” in the event that the apartment from which the tenant had been evicted had been re-rented to another tenant whose removal would be “inappropriate”]).

 The curfew was 9:00 p.m. on Sundays, 11:00 p.m. Monday through Thursdays, and 1:00 a.m. on the other two days of the week.